The first case for argument this afternoon is case number 19-2879, Southern Iowa, United States v. Chad Soderman. Counsel, we're prepared to hear your argument. Thank you, Your Honor, and thank you all the judges for allowing me to argue the case on behalf of my client, Mr. Soderman. We have before us a case that seemingly has a lot of issues, but much like a hike to an out-of-the-way fishing spot, we're going to have to get through all the trees and weeds to find that one place we need to get to. In this case, the place we need to focus on is the automobile exception. The district court judge found, after getting through all those weeds we talked about, of inevitable discovery, and foreign tourist searches, Leon, that the automobile exception was the one exception to the Fourth Amendment's warrant requirement that saved the search in this case. That was even though the car at issue was taken to the police impound lot. To find that the automobile exception applied here, the district court cited the Castaneda case from this circuit. Before getting to the Castaneda case, I did want to go back in time a little bit to talk about the automobile exception. It started, of course, with the Supreme Court's case in Carroll. That's where the court found that the automobile exception was one exception to the warrant requirement because of the mobility of automobiles that created an exigency that the cars needed to be searched. Then that was changed a little bit in the Chambers case, and that had to do with kind of similar facts to the case at issue of a car that was taken to an impound lot. The Supreme Court found that you can take a car to a lot and hold it for a magistrate to issue a warrant, or you can search it right on the side of the road. Then, of course, later on we get to the Eighth Circuit Castaneda case, and that had a pretty succinct holding of search the car at the impound lot or search the car at the side of the road. The government, in their brief, argues that the automobile exception exists solely because of reduced expectation of privacy. They cite to the Blaylock case in their brief, and that talks about how because the openness of car passenger compartments and the fact that cars travel on open highways and are regulated on those highways, there's that reduced expectation of privacy. I know in our briefs we didn't discuss at all the reduced expectation of privacy and how that contributes to the automobile exception, but just that reduced expectation of privacy I don't believe is the entire story of the Blaylock case. In Blaylock, the court also said the automobile exception justifies warrantless searches of a car with those two theoretical underpinnings, the exigency or the mobility of the car and also the lowered expectation of privacy. And so Blaylock says you can't have the automobile exception without those two theoretical underpinnings. And then the Blaylock case goes into kind of a more detailed discussion in that case than the Castaneda case. In Blaylock, when they discuss whether the exception applied, they focus on those two theoretical underpinnings. Is your argument then that we should ignore Castaneda or depart from it or write around it? I'm just trying to understand because it seems that we've already held that you can use the automobile exception in the impound lot, rightly or wrongly. Your Honor, I'm not saying ignore it, but I do think that Castaneda, again, they kind of similarly say search the car at the impound lot or the side of the road. I think Blaylock has a more detailed discussion of when that can apply. I don't think it's just, you know, let's just search a car anywhere. There still has to be those two theoretical underpinnings that were discussed in Blaylock. One, there's the exigency, and then two, there's the lowered expectation of privacy. What about the possibility, though, that, and I know maybe this doesn't apply in this case, but the exigency really comes from the fact that the automobile is mobile. It's in the name, right? And so theoretically, your client could have retrieved the car from the impound lot or a family member could have retrieved it from the impound lot. So even at that point, there could have been an exigency because any minute, somebody could have shown up and taken the car. Your Honor, I understand that argument. But again, as you said, I mean, it's not really what happened in this case. The car was towed to the impound lot. The officer took time over the weekend to try and get a warrant, even though she ultimately did not get a warrant, and then took it back and searched the car. And so just taking that police impound lot really removes any exigency from the car. It renders the car immobile, so to speak. It's not like the car in Blalock or some of the other cases where it dealt with a mobile car. You can move it from the house. You can move it just along the highway. You can move it wherever. Taking the car and seizing it removed that exigency. So in Mr. Soderman's case, as I said, there wasn't an exigency, although his car was just like any other. It had that lowered expectation of privacy. It was regularly on the highways. It was moving along the highways. But again, the two theoretical underpinnings of the exception aren't present in this case. And so again, we believe the automobile exception doesn't apply just for that reason. But if the court does find it applies, we believe looking at all the facts in this case, there weren't sufficient facts to raise the level of reasonable suspicion to extend the stop. And likewise, looking at the same facts, there weren't facts for probable cause. And the reason I say that is when looking at the warrant application that the officer did and also the officer's testimony, most of the facts that they used for probable cause determination were also the same facts they used for reasonable suspicion to extend the stop. And so look at the government's brief. I understand the government's argument is, you know, what we're trying to do is this divide and conquer analysis of each individual fact. But really, that's not what we're trying to do. I mean, what we're trying to show the court is that each fact was mischaracterized by the government and the district court. And they fall into a few different categories. I mean, some facts are, when you look at them, I mean, so innocent when viewed alone. I mean, it's not something that could be part of the probable cause equation. Some of these facts are, you know, the presence of the sodas or energy drinks, the snacks in the car. I mean, looking at those facts, it's just seemingly impossible to include them in that probable cause determination because that describes so many motorists on the road. And then there's some facts the officers didn't consider. And this was brought up in one of the exhibits, I believe it was Exhibit 6, the car video, when the officers were talking about the marijuana use and how it didn't matter because he was from Colorado. Even though the officers didn't consider it, the district court did consider it. So it's at odds with the fact the officers didn't even consider that in their reasonable suspicion. Although it was later put in the probable cause affidavit. Other factors didn't have a basis in the record for the court to consider. Officers testified about the cash in the case. The government argued a few times in the brief, $3,400 is a lot of money. And that's belied by the fact the officers testified. They didn't know actually how much money it was. They just saw a lot of bills. Are there a lot of bills? Do you think that's sufficient if you see a bulging wallet? Do you think it's necessary to know how much that is? Well, I would say it is, Your Honor, because, I mean, a lot of bills, is it $50 in bills, which is an amount a lot of people carry around on them? I mean, you know, my daughter who's eight years old probably has $25 in ones in her wallet. I mean, if it's a lot of bills, it's a lot of bills. If it was, you know, $2,500, $2,500 bills, then yeah, I think it's a lot. But again, the officer testified. He didn't see how much was in here. It's not like the case we cited in our brief where officers had found, you know, bills that were packaged in such a way as are normally packaged by drug dealers, and the officers could tell what the denominations were. What about that coupled with the fact that his father admitted that he had been involved in drug trafficking in the past, and his story was, I'm going to visit an ill, I think an ill stepmom, and then talk to the father, and the father had no idea, you know, that he was coming. So clearly, you could draw the implication that he was lying about the purpose of the visit. Well, Your Honor, I don't think you can clearly draw that. I mean, I know the officers may have had that suspicion at the time, although, you know, the stepmom did end up passing away of cancer. It's clear she had cancer. And I believe the father on that Exhibit 6 video had mentioned on the phone call, he knew Soren was going to come at some point, just didn't know when it was going to happen. As far as the statement about the not recently, you know, the conversation about the drug trafficking, Officer Merchant asked, you know, has he ever been involved in drug trafficking? And the dad said, not recently. But again, there's just no follow-up by the officer to say, explain that to me. It's just that one statement put in a vacuum and then packaged into the probable cause determination. So again... Go ahead and finish your answer to Judge Strickland. I was going to switch subjects. So if you want to ask your question, Your Honor. Well, maybe we're switching to the same subject. I have a question about your motion to suppress the statements, the Miranda violation that you assert occurred. What statements are you seeking to have suppressed? And maybe another way of asking that is at what point was he in custody? And you think that the statements made thereafter should not be admitted? Yes, Your Honor. Again, we believe the point he was in custody was about 10 minutes into the stop. I believe, again, going back, I think the officer Reyes had testified that, you know, the point at which he was done writing the tickets was about 10 minutes into the stop. I think it was 10 to 15 minutes maybe in the stop. And that's the point where we're asserting, you know, there's that lack of reasonable suspicion to extend the stop beyond what was necessary to write those tickets. And we believe, you know, all the factors showed he was in custody. Just going with the Miranda argument, the government is essentially arguing if it's a traffic stop, there's this per se rule that you don't need Miranda warnings. But I think even the district court acknowledged that you do still need Miranda warnings if the stop turns into a custodial interrogation. And that's a follow-up question as well. I didn't see much discussion about interrogation because even if he was in custody, if there was no interrogation, those statements would not be suppressible. That wasn't really developed at the district court, though, was it, because of the district court's ruling? Yes, Your Honor. I believe that's true. But I do think there was sufficient evidence in the record to show he was interrogated. I mean, there's the officer's body cam. There was limited questions about it. But we do believe there was interrogation that happened. It was custodial, the reasons we cited in our brief. I will say I'm cutting in my rebuttal time, so I'll ask for the rest of my time for rebuttal. Thank you. You may. Counsel? May it please the court, Michael Duffy on behalf of the United States. There are three issues in this case from the government's perspective. First, that the stop was validly extended. Based on reasonable suspicion. Two, that there was probable cause to both seize and search the vehicle in this case. And then finally, the Miranda issue. And the government takes a position that Miranda was not required to be given to Mr. Soderman. And I will start with issue two on probable cause. From the outset of the stop, there were indicators to the trooper that there was something unusual. It began with driving along next to Mr. Soderman and seeing him nervously tap the steering wheel as the trooper was about to make the traffic stop. When he did make the stop, he saw that Mr. Soderman had all of his information ready outside the window. License, registration, proof of insurance, and that his hands were shaking. And that he was breathing heavily. He appeared to be nervous. Also, he noticed the snacks, including a loaf of bread, as well as the energy drinks, such as Mountain Dew. And once he comes over to the car, the trooper is very clear that he wants him to come sit in the vehicle with him. And Mr. Soderman is very reluctant to do so. And the trooper believed, he testified that he thought that Soderman was distancing himself from the trooper. There was a large amount of cash. It was $3,400. But to the point as to what the officers knew at the time, certainly the government takes the position that the money would have appeared to be a large amount of cash simply just by looking at it. And that's what the officers believed when they looked at it. But they also knew, when we talk a little bit later about Mr. Soderman's idea that he wanted to tow the car himself, when the trooper told him, that's going to cost thousands of dollars for you to do that, Mr. Soderman said, you see the cash that I have, I can pay for it, I'll pay cash. And also, later on, Officer Merchant, when she's discussing that with him, she says to him, so you've got a lot of cash? And he says, yes, I make $50 an hour as a property maintenance man. So, there was no guessing about the fact that Soderman was in possession of a large amount of cash. Then, of course, there was the aftermarket wires. I wanted to ask you about that, Counsel, because I remember my time in college. I had a car and I made changes to it myself, put in new speakers and things like that. I'm a little more organized now and I have people do it for me. But I had aftermarket wires sitting on the floor of my car for new speakers. What does that exactly show and what was the testimony supporting that? Because in isolation, I've got to believe that's not very incriminating. Certainly, Your Honor. The officer had training in drug interdiction that's detailed both in her testimony below, as well as the government's exhibit with the affidavit and the search warrant, about the types of drug trafficking and interdiction training that she has had. And she testified and also put into the record for the state court judge to look at in the affidavit that the aftermarket wires indicate that there could be a vehicle hide situation going on, where things have been changed around in the car to make room in the vehicle so that drugs could then be hidden. And then those aftermarket wires are brought in after the fact. So I believe that that is the case there. So the idea would be you remove the wires to put in a hiding spot and then you have to replace the wires for the car to function properly? Certainly, Your Honor. Yes. That would be the government's position based on the officer's testimony and her affidavit. Also, to that point, once Mr. Soderman is in the car, he has an unkempt and unpleasant odor, which indicated to the officer's training and experience, again, that Mr. Soderman did not want to stop, had not stopped to shower or change his clothes, and wanted to get to where his destination was as expeditiously as possible and limit his time on the road. And certainly one of the key facts in this case the government submits is the very bizarre and overreaction to the news that his license was suspended. It's highly unusual to react the way that he did to the suspended license, where he's really pleading and begging with the trooper to not go by what the dispatch computer says and to instead rely on bank statements that he has on his phone so that he can drive off in his car and not have his car be impounded. And then certainly that overreaction is propounded by this, again, very highly unusual request that he's going to tow his own vehicle from Council Bluffs, Iowa, to the border of Iowa and Minnesota. And in looking at that, even with the troopers, relatively just a few years on the road, that struck him as incredibly odd, which is why you have the other officer responding to help with much more experience to be able to look at this. And certainly if you look at the demeanor of Mr. Soderman the whole time, he's agitated, he's nervous, he's confused about where he was, and he's not able to orient himself, even though the officers tell him at different points in time during their interaction that where he is and that he's not in Des Moines on I-35 North headed towards Minnesota. He's much further away. He doesn't explain to the officer when he's asked why it's so problematic that he be separated from his car. It's not a problem, he says, to have his mother and stepmother come down within four or five hours, it would take, I suppose, to come retrieve him, but he does not want to be separated from his car and does not want the car to go in police custody. And that becomes very clear throughout their interaction that that is the issue. He also repeatedly moved the discussion back to the driver's license issue, which based on the officer's training and experience was consistent with a drug trafficker wanting to deflect the discussion and to move the discussion away from the drug trafficking inquiry or the suspicious facts inquiry and focus more on something else. And of course, Judge Strauss, as you mentioned, the father and stepmother did not know he was coming and at least based on what the officer felt at the time, the information available to her, which we would submit under this court's precedent, due weight would be given to her reasonable actions to think that that was an inconsistent statement. And indeed, she confronted him with that and only then did he say, oh, no, they knew I was coming, just not today. They knew I was going to come at some point. Also, the father's mention of the, well, not recently, that was also not just a statement in isolation from the father. That also was confirmed when the officers were speaking to Soderman. After that, he confirmed that he had a history of using hard drugs in the past and that he had been clean for years. And then we also have another bizarre reaction when the officer tells him that they might be, they might have a dog to come out and sniff the car and he reacts to that in a very unusual way by saying, well, it's not that they would find drugs in the car that he's concerned about. He says he's concerned that they might smell the marijuana that was smoked in there three weeks before, which is an unusual thing to say in response to that and may indicate that he has some knowledge of canine dogs and what they can and can't smell. And of course, he was repeatedly asking to smoke a cigarette, which again goes along with his behavior. Turning to the point that my friend Mr. Roth made about the automobile exception. Certainly in this case, the government takes the position that the probable cause needed to seize the car is the same as it is to search it and that there is no requirement that they, that they search it on the side of the road. They're allowed to take it to the impound lot, we believe and submit that the law is clear on that point. I would also respond to the issue on the Miranda warnings not being required. The defendant was not in custody and we think that we submit that the most clear example of that is when Soterman asked, am I being detained? And he's told, well, you have a suspended license so you can go to jail for it if you want. And he says, I'm not trying to go to jail. And so instead what the officer does and the trooper does is that they continue to try to figure out what to do with him and what to do with his car. And that is predominantly the inquiry that takes place because ordinarily they would just say, call somebody locally, have them come pick you up, we'll tow your car, here's the address for the impound lot, and then that would be how that situation would be resolved. But given this highly unusual request to tow the car and to not let the officers do that, that of course takes up a lot of time there. But what about the officers telling him, well, we can bring a drug dog here, either consent or bring a drug dog, sort of indicates some kind of pressure from the officers to, I don't know, it's an exertion of sort of authority over him? Judge Kelly, the government would take the position that the officers were not behaving in coercive fashion. I believe that the officer was actually, and actually said she was trying to be very straight up and very, I think she said she was a straight shooter with him and said words to the effect of, I don't want to go the long way if I don't have to because I feel at this point that I can seize your car and apply for a search warrant, which she said she would do. And that wasn't an empty threat. She did in fact do that. And Mr. Soderman, he said in response to that, that he was very adamant he would not give consent. But her point was, if you would let me search the car and then when he declined that, she said, well, if there's something in the car you don't want me to see, could you let me just take a more limited search? And she's trying to, if there's nothing going on, then she's trying to let him get back to being able to go on his way and have the suspended license issue taken care of without having to seize the car. When she mentioned that the drug dog at that point, did the officers know there was not a canine available at that time when they told him that was a possibility? Your Honor, I believe the record in the case was that she knew that there was a drug dog in the area, but that she wasn't sure how long it would take for the dog to show up. And so the way she looked at it was the dog may come or may not come. So, but of course, as I mentioned earlier, the question elicited what we submit would be additional grounds for probable cause because of the telling admission that he has in response to the drug dog. But certainly when the officers discussing with him at about 8, 10, she just tells him point blank that she's investigating drug trafficking and she says, I'm trying to give you your options. The government submits that's not coercive. That's just her being practical by saying, I can deprive you of your car for this amount of time. Or if you're willing to give me consent to search, then we can do that. Or if you're not willing to do the search, then we could wait for a drug dog if you'd be willing to wait. On the other issue of interrogation, what's the government's position on whether there was any interrogation? Your Honor, our position is that this falls directly within Terry. This is a Terry stop in those line of cases where the officers are asking questions based on reasonable suspicion. And instead of having the answers dispel that suspicion, instead what we have is the more answers that are given, the suspicions are confirmed. And right up until the point where the officer says to him, I believe around 8, 30, I'm going to seize your car and you're free to go. Certainly at that point, he's no longer being detained. He's free to walk away. And I think she tells him, we have no cause to hold you, but we do it for your car. And so that, coupled with the initial discussion about when he was detained and told that he was detained and why, and that he wasn't going to be taken to jail, the government's position would be that this is a Terry stop all the way through and Miranda warnings would not be required because of that. I would also mention that as to the other issue in the case as far as extending the traffic stop, we would cite the Murillo Salgado decision that was cited by the district court. I don't believe it's cited in the government's brief, and I apologize for that. But we would cite that case as a post Rodriguez line of cases that would be in line with what happened here in this case as far as the extension of the stop based on reasonable suspicion and that the traffic stop did change the course from speeding to the suspended license issue. And then finally, to the drug trafficking suspicion. And unless the court has any further questions, the government will submit with those comments. Thank you. Thank you. Rebuttal. Thank you, Your Honor. I did just have a couple points about rebuttal moving right in back to the Miranda issue I was talking about before and ask questions about Judge Kelly, specifically about the talking about the police dog that was maybe on its way or maybe not. I mean, in the record on Officer Merchant's body cam in the suppression transcript, Officer Merchant had told Officer Reyes, I'm going to pull up Mr. Soderman and say there's a dog on the way to the church. It's on exhibit six or body cam. We talked about it at the suppression hearing. Those were coercive, strong armed police tactics that cuts in favor of the fact that Mr. Soderman was in custody at the time. Looking at all the factors to determine whether somebody was in custody, there was just one factor, the fact that he left at the end of the interrogation that cuts in favor of the government. So we believe he was in custody at the time. The other thing that the government had mentioned during their argument, the government had talked a lot about all the different facts of the case, supporting probable cause, the behavior about license suspension, calling it the most bizarre reaction. I would submit to your honors that somebody thinking they paid child support and then being told they hadn't had their license suspended because of it, I believe anybody would react in that manner that Mr. Soderman reacted. I believe that's all the points that I have. If your honors have no further questions, I would also submit the case. I see no additional questions. Thank you both for your arguments here this afternoon. We appreciate them and we appreciate your willingness to appear by video. We'll take the matter under advisement.